## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Robert Paul Dols,                                    Case No. 16-cv-3815 (TNL)

        Plaintiff,

v.                                                              **ORDER**

Nancy A. Berryhill,[1]
Acting Commissioner of Social Security,

        Defendant.

---

James H. Greeman, Greeman Toomey, 250 Marquette Avenue, Suite 1380, Minneapolis, MN 55401 (for Plaintiff); and

Ann M. Bildtsen, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Robert Paul Dols brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. *The Acting Commissioner of Social Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner.html (last visited Feb, 19, 2018). Commissioner Berryhill is automatically substituted for the previous Acting Commissioner of Social Security Carolyn W. Colvin. Fed. R. Civ. P. 25(d) (public officer's successor is automatically substituted as party when officer ceases to hold office while action is pending).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 12, 14.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment (ECF No. 12) is **DENIED** and the Commissioner's motion for summary judgment (ECF No. 14) is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI in September 2013, asserting that he has been disabled since April 2013 due to, among other things, anxiety, depression, Asperger's syndrome, and a mood disorder.[2] (Tr. 13, 124-25, 140; *see* Tr. 211-16, 237.) Plaintiff's application was denied initially and again upon reconsideration. (Tr. 135, 137, 139, 152; *see* Tr. 156-64.) Plaintiff appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 13, 165; *see* Tr. 168-78, 172-78.) The ALJ held a hearing on August 11, 2015. (Tr. 13, 55-101; *see* Tr. 181-202, 205-10.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. (Tr. 1-4, 7-8.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) Plaintiff moved for summary judgment on March 31, 2017 (ECF No. 12), and the Commissioner filed a cross motion for summary judgment on May 15, 2017 (ECF No. 14). This matter is now fully briefed and ready for a determination on the submissions.

---

[2] Plaintiff also asserted that he was disabled due to arthritis in his back and knees. (Tr. 124, 140.) Plaintiff's physical impairments, however, are not presently at issue. *See infra* Section III.

2

## III. RELEVANT MEDICAL HISTORY

Although Plaintiff sought benefits based on both mental and physical impairments, the instant action relates only to Plaintiff's mental impairments. Accordingly, the Court focuses on the evidence in the record concerning these impairments.

### A. Background

Plaintiff "lived with his parents until he was almost 50 years old." (Tr. 311; *accord* Tr. 324.) When Plaintiff's father passed away in 2004, Plaintiff "stopped working and assumed full-time caretaking of his mother" until "[s]he transitioned into a nursing home in 2006." (Tr. 311; *accord* Tr. 324.) Following the passing of his mother, Plaintiff "was able to support himself for a few years through inheritance," but "was unable to maintain employment" and eventually became homeless. (Tr. 312; *accord* Tr. 324.)

Plaintiff has a history of alcohol and marijuana use since he was a teenager and completed a residential treatment program in 2011. (Tr. 312, 325; *see* Tr. 375-388, 391-92.) Plaintiff has also been treated for depression for "decades." (Tr. 312; *accord* Tr. 325; *see* Tr. 381, 393, 403.) His diagnoses include a mood disorder and alcohol dependence. (Tr. 312, 325.)

In 2011, Plaintiff underwent a neuropsychological evaluation. (Tr. 312, 325.) Plaintiff's "intellectual results" and "[n]ew learning and recent memory abilities were low average." (Tr. 312; *accord* Tr. 325.) The "[e]xecutive and attentional measures varied from low average to mildly defective." (Tr. 312; *accord* Tr. 325.) Plaintiff was diagnosed with "alcohol-induced persisting dementia." (Tr. 312; *accord* Tr. 325.)

**B. 2012**

In mid-March 2012, Plaintiff was admitted to a residential treatment program. (Tr. 414-23, 424-67.)  Plaintiff was discharged in May after completing the program. (Tr. 419-23, 424-27.)  In the discharge summary, it was noted that Plaintiff "appeared quite depressed and described himself as having a negative attitude about his life and prospects for feeling good about himself" upon admission.  (Tr. 420; *accord* Tr. 425; *see* Tr. 434, 444, 446, 449, 451, 453, 457, 459, 460, 462, 464, 466.)  During the course of treatment, it came to light that Plaintiff was in a relationship with another individual who was physically and emotionally abusive to him.  (Tr. 420, 425-27, 451, 453, 454, 464, 466, 467; *see* Tr. 436-37, 447.)  At the time of discharge, Plaintiff was feeling much better about himself and it was noted that Plaintiff would not return to the same sober residence as before but rather live in a different sober residence away from this individual.  (Tr. 420-21, 425-26, 451, 453, 464, 466.)  Plaintiff "agreed, reluctantly[,] that he would be better off in a place far enough away from [this individual] to reduce the likelihood of continuing that relationship."  (Tr. 420; *accord* Tr. 425.)

Between May and July, Plaintiff participated in an outpatient relapse recovery program to address his use of alcohol and marijuana.  (Tr. 308.)  The relapse recovery program consisted of a number of group sessions.  (Tr. 308.)  In his discharge summary, it was noted that Plaintiff attended the required number of program hours and "continue[d] to attend a minimum of [two] groups per week for continued support."  (Tr. 308.)

While it was noted that Plaintiff did "not appear cognitively impaired as previously documented," it was also noted that Plaintiff "does not engage in typical or expected personal interaction with others both within the sober living community and within the group dynamic." (Tr. 308.) Plaintiff was also noted to have "some difficulty establishing relationships and building trust." (Tr. 308.) Plaintiff "expresse[d] significant frustration about his difficulty stepping away from past relationships where he describes heavy chemical use along with verbal and physical abuse." (Tr. 310.)

Specifically addressing Plaintiff's emotional, behavioral, and cognitive abilities, it was noted that Plaintiff reported having depression, but he was taking Prozac[3] to manage his symptoms and his mental health was stable. (Tr. 309.) It was noted, however, that the following behaviors were demonstrated by Plaintiff: "lack of direct eye contact, distinctive and awkward non-verbal communication, speaking forcefully and with a loud voice, mild paranoia regarding peer interactions within him, ruminating thought patterns and a general overall concern with being socially isolated from others." (Tr. 309.) Plaintiff was scheduled for an "assessment of autism spectrum disorder, specifically Asperger[']s Disorder," in April 2013. (Tr. 308; *see* Tr. 309.)

In late November, Plaintiff saw Steven J. Carney, M.D., with complaints of depression and anxiety, among other things. (Tr. 343.) Plaintiff reported that he was on Prozac and "fel[t] like he ha[d] good control of the depression." (Tr. 343.) Plaintiff reported that his anxiety was better with medication but "not under ideal control,"

---

[3] Prozac is a brand name for fluoxetine, a medication used to treat depression, obsessive compulsive disorder, and panic attacks. *Fluoxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a689006 html (last visited on Feb. 16, 2018).

reporting "a little bit of anxiety" approximately every other day.  (Tr. 343.)  Plaintiff was wondering if additional medication would help.  (Tr. 343.)  Dr. Carney refilled Plaintiff's Prozac prescription and prescribed BuSpar[4] for Plaintiff's anxiety.  (Tr. 344.)  Plaintiff was directed to return as needed.  (Tr. 344.)

### C. 2013

Plaintiff returned to Dr. Carney near the end of February 2013.  (Tr. 341.) Plaintiff reported that he had recently started seeing a psychiatrist and was told that he might have Asperger's syndrome.  (Tr. 341.)  Plaintiff requested neuropsychological testing.  (Tr. 341.)  Plaintiff reported that BuSpar did not really seem to help his anxiety. (Tr. 341.)  Plaintiff's depression remained "under very good control."  (Tr. 341.)  Dr. Carney prescribed Zoloft[5] in place of Prozac and BuSpar in an effort to better address Plaintiff's anxiety and ordered neuropsychological testing.  (Tr. 341-42.)

Plaintiff had a psychotherapy session with Michael Scott around the middle of March.  (Tr. 474.)  Plaintiff reported that he continued to live in a sober residence.  (Tr. 475.) Plaintiff also reported that he was "fearful that a friend of his might try to extort money from him" if he received SSI.  (Tr. 475.)  Plaintiff was feeling better, however, with Zoloft and Scott noted that Plaintiff was "[l]ess constricted, more verbal, and appropriate."  (Tr. 475.)

---

[4] BuSpar is a brand name for buspirone, a medication "used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety."  *Buspirone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/ druginfo/meds/a688005 html (last visited on Feb. 16, 2018).
[5] Zoloft is a brand name for sertraline, a medication used to treat depression, obsessive compulsive disorder, panic attacks, and social anxiety disorder.  *Sertraline*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus. gov/druginfo/meds/a697048.html (last visited on Feb. 16, 2018).

At the same time, Scott noted that Plaintiff's mood was "[d]ysphoric" and he was "[a]ngry, fearful[, c]autious, [and] guarded."  (Tr. 474.)  Plaintiff was "[d]isheveled," "[m]a[d]e noises," displayed "[f]urtive sidelong glances," and had "[p]oor eye contact." (Tr. 474.)  Plaintiff also had a "[m]arked lack of insight."  (Tr. 474.)  Scott listed Plaintiff's diagnoses as depressive disorder, "[p]robable Asperger's" syndrome, and alcohol and marijuana dependence in remission.  (Tr. 475.)  Scott noted that he "[m]ay consider a referral to adult protection," but it was "[u]nclear if [Plaintiff] is currently a vulnerable adult."  (Tr. 475.)

In his next session with Scott approximately one month later, Plaintiff's "[a]ffect ha[d] returned to previous baseline."  (Tr. 473.)  He was "[d]isheveled," "[a]ngry, sullen, [and] hostile."  (Tr. 473; *see* Tr. 472.)  Plaintiff had a "[m]arked lack of insight," "[p]oor eye contact," and "[p]oor social skills."  (Tr. 473; *see* Tr. 472.)  Plaintiff reported watching television and doing "little else."  (Tr. 473.)  Scott "[u]sed problem solving methods for finding some activities that may fill [Plaintiff's] time."  (Tr. 473.)  For example, Plaintiff's bike had no brakes, and so they "[l]ooked at [an] upcoming county auction site to see about a possible new bike."  (Tr. 473.)  Scott "[e]ncouraged [Plaintiff] to consider activities outside [his sober residence] such as an introduction to computers class," but Plaintiff was "not receptive to this."  (Tr. 473.)  Scott noted that Plaintiff felt "he ha[d] been unjustly caught up in a 'sting' on his last DWI," and did "not appear to be motivated for sobriety."  (Tr. 473.)

Plaintiff presented similarly at his next session with Scott in May.  (*Compare* Tr. 470-71 *with* Tr. 472-73.)  Plaintiff continued to "[p]erseverate[] about how he was caught

7

in [a] sting operation and that this is how he got his last DWI." (Tr. 471.) Plaintiff "[t]end[ed] to ramble about the same issues." (Tr. 471.) In addition to being disheveled, Scott noted that Plaintiff was "unshaven[ and] belching." (Tr. 470.)

In approximately early June, Plaintiff underwent a neuropsychological consultation based on Dr. Carney's referral. (Tr. 311, 324.) Nancy Kaley, BS, LADC, Plaintiff's counselor, accompanied him to the evaluation. (Tr. 311, 324.) Kaley "expressed concern that [Plaintiff] was not progressing in his recovery." (Tr. 311; *accord* Tr. 324.) Kaley stated that Plaintiff "does not connect well with other residents at the halfway house"; "appears aloof and disinterested in relationships"; and "frequently avert[s] his eyes during interaction[s]." (Tr. 311; *accord* Tr. 324.) Plaintiff also "frequently clears his throat, purses his lips, and shows facial ticking." (Tr. 311 *accord* Tr. 324.) At times, Plaintiff will "yip[], yell[], and make[] squealing noises." (Tr. 311; *accord* Tr. 324.) Plaintiff also "utter[ed] repetitive statements" and engaged in "repetitive arm movements." (Tr. 311; *accord* Tr. 324.) Kaley "suspect[ed] that [Plaintiff] has a subtype of pervasive developmental disorder." (Tr. 311; *accord* Tr. 324.)

During the evaluation, Plaintiff reported having "interpersonal conflicts and difficulty with others since childhood." (Tr. 311; *accord* Tr. 324; *see* Tr. 312, 325.) Plaintiff "first noticed tic-like symptoms in junior high." (Tr. 311; *accord* Tr. 324.) Plaintiff also reported "feeling inferior as well as mistreated and abused since childhood." (Tr. 311; *accord* Tr. 324.) Plaintiff reported that these feelings escalated after the death of his parents "and he had to fend for himself." (Tr. 311; *accord* Tr. 324.) Plaintiff reported turning to drugs and alcohol for relief. (Tr. 312, 325.)

8

Plaintiff reported that he had been unemployed for the past nine years.  (Tr. 312, 325.)  Plaintiff previously held positions in shipping and receiving, at a warehouse, and with a silkscreen company, but "[r]ecurring interpersonal wrangles and non-attendance from alcoholism contributed to job loss."  (Tr. 312; *accord* Tr. 325.)  Plaintiff never married and has no children.  (Tr. 313, 326.)  Plaintiff "never dated or had a significant other" and "never cultivated friendships."  (Tr. 313; *accord* Tr. 326.)  Plaintiff's social support and contacts were his parents and a brother.  (Tr. 313, 326.)  Plaintiff reported that he did not like living at the recovery halfway house, but intends to remain there for the foreseeable future.  (Tr. 313, 326.)  Kaley noted that Plaintiff "has responded to well to structure and support, despite lack of affiliation with others."  (Tr. 313; *accord* Tr. 326.)    Plaintiff was "compliant with [the halfway house's] rules and active in housekeeping."  (Tr. 313; *accord* Tr. 326.)

Plaintiff was "cooperative" and "actively engaged" in the evaluation.  (Tr. 313; *accord* Tr. 326.)  Plaintiff's behavior was described as follows:

> His alertness was normal.  Attention was average, and motivation was average or stronger.  Effort was sustained at ample levels for valid assessment.  Orientation was intact. Demeanor was well-intentioned yet detached, asocial, unskilled, and immature.  Gaze was averted.  Countenance was scowling.  Rapport was sufficient.  Insight into referral issues was satisfactory.  Comprehension of test instructions was intact.  Spontaneous conversation was minimal.  He frequently cleared his throat.  He was heard making a high-pitched noise while alone in the testing room.  Verbal responses were communicated clearly without appreciable dysnomia or other dysphasia.  Perceptual problems were solved carefully for the most part.  Figure drawings were adequately organized.  Memory retrieval was variable and dysexecutive.  Affect was tense and irritable, yet he was

generally polite and compliant. Response to success and
failure was minimal. Conduct was otherwise not overtly
unusual.

(Tr. 313; *accord* Tr. 326.)

Plaintiff underwent a series of tests to assess his intellectual, memory, executive,
language, and other abilities as well as his personality function and adaptive skills. (Tr.
313-15, 326-28.) With respect to his personality function, Plaintiff's "clinical profile"
was "abnormal" and he exhibited "neurotic symptoms." (Tr. 315; *accord* Tr. 328.)
"Anxious-depressive disorder [wa]s indicated," and was noted to be "partly a
consequence of developmental disability and its social concomitants." (Tr. 315; *accord*
Tr. 328.) Plaintiff's "coping [wa]s maladaptive under pressure" and evident in his
alcohol abuse. (Tr. 315; *accord* Tr. 328.)

Overall, the results of Plaintiff's neuropsychological evaluation were "abnormal"
and "compatible with cerebral dysfunction of at least mild magnitude." (Tr. 315; *accord*
Tr. 328.) His "mental abilities [we]re lower than expected in a few domains." (Tr. 315;
*accord* Tr. 328.) His "[a]daptive skills [we]re moderately or markedly low, affecting
communication and interaction." (Tr. 315; *accord* Tr. 328.) Plaintiff's
"[e]xecutive/[a]ttentional abilities [we]re mildly or markedly low." (Tr. 315; *accord* Tr.
328.) It was noted that "[m]ost" of Plaintiff's neuropsychological abnormality was
developmental in nature and "related to an autism-spectrum disorder." (Tr. 315; *accord*
Tr. 328.) "Some" of his neuropsychological abnormality was "organic" and related to his
history of alcohol and drug use. (Tr. 315; *accord* Tr. 328.)

10

Plaintiff was noted to be "susceptible to alienation, indiscretion, distraction, and disorganization." (Tr. 316; *accord* Tr. 329.) Plaintiff was "limited in judgment and insight." (Tr. 316; *accord* Tr. 317, 329.) Plaintiff also manifested an "inflexibility in modifying maladaptive behavior such as substance over-use." (Tr. 316; *accord* Tr. 317, 329.) Continued mental-health and substance-abuse services were recommended. (Tr. 316, 317, 329.) It was also noted that Plaintiff "could be considered for future placement in a semi-independent or shared-living facility with on-site supports." (Tr. 316; *accord* Tr. 317, 329.) Lastly, Plaintiff's "prospects for substantial gainful employment" were described as "marginal," and he would be "best in positions that do not place much emphasis on social maturity and sustained interaction with others." (Tr. 316; *accord* Tr. 317, 329.)

Plaintiff met with Scott again in June. (Tr. 468-69.) Again, Plaintiff was angry, hostile, fearful, cautious, and guarded. (Tr. 468.) He likewise had poor eye contact and a marked lack of insight. (Tr. 468.) Plaintiff also continued to be disheveled and unshaven, and belched. (Tr. 468.) Plaintiff remained focused on the DWI sting operation. (Tr. 469.) Plaintiff did, however, now have a "functioning bicycle" and Scott encouraged Plaintiff "to get out more to improve his mood." (Tr. 469.)

Scott noted:

> At the beginning of the session time, [Plaintiff] was still in his outpatient [chemical dependency] group down the hall. When he was let out of the group, [Plaintiff] went to the kitchen and had to [be] retrieved from there for his appointment. When I turned away from him during the session to print out a bike map, (I was telling him what I was doing), he got up and left the office and had to be retrieved

> again from the kitchen. The sum total of his conversation
> involved his resentment and anger at being caught in a "sting"
> operation for his most recent DWI 15 months ago.

(Tr. 469.) Scott further noted that Plaintiff "seems unable to let go of his anger." (Tr. 469.)

At the end of July, Plaintiff presented to Teresa A. Tran-Lim, M.D., based on a referral by Dr. Carney to evaluate Plaintiff's mental function. (Tr. 319, 335.) It does not appear that Dr. Tran-Lim had access to the results of the neuropsychological consultation Plaintiff had recently undergone during this appointment. (*See* Tr. 318-19.) Dr. Tran-Lim noted that Plaintiff was "generally quiet, poor historian, gives short responses to question[s] and had to be prodded for detail." (Tr. 319; *accord* Tr. 335.) Dr. Tran-Lim further noted that Plaintiff's depression and anxiety were currently being managed by Dr. Carney and Plaintiff was taking sertraline.[6] (Tr. 319, 335.) Dr. Tran-Lim observed that Plaintiff was well groomed, with a flat affect, and "generally slow cognitively." (Tr. 321; *accord* Tr. 337.) Dr. Tran-Lim noted that Plaintiff 'does have significant psychiatric issues with alcohol dependence and depression/anxiety" and referred Plaintiff for neuropsychological testing, indicating that Dr. Carney had already placed such a referral. (Tr. 322; *accord* Tr. 338.)

In August, Plaintiff met with psychiatrist Thomas C. Winegarden, M.D. (Tr. 352, 489-90.) Plaintiff reported a history of Asperger's syndrome, alcohol dependence, and depression. (Tr. 352, 490.) Plaintiff continued to reside at the sober house. (Tr. 352, 490.) Plaintiff reported that he had been taking Zoloft but "it seems to have pooped out."

---

[6] *See supra* n.5.

(Tr. 352; *accord* Tr. 490.)  Dr. Winegarden diagnosed Plaintiff with recurrent depression and Asperger's syndrome, and prescribed a Viibryd[7] titration.  (Tr. 352, 490.)  Dr. Winegarden also recommended that Plaintiff continue attending AA meetings, stay sober, and be in regular contact with his sponsor and the sober house.  (Tr. 352, 490.)

Plaintiff followed up with Dr. Winegarden approximately one month later.  (Tr. 351, 488-89.)  Plaintiff was "still ruminating" and "fe[lt] irritable, agitated, chronically dysphoric or unhappy and [a] roller coaster ride of emotions."  (Tr. 351; *accord* Tr. 488.) Plaintiff reported that he was "staying sober[ and] regularly attending AA meetings," but did not yet have a sponsor.  (Tr. 351; *accord* Tr. 488.)  Plaintiff "realize[d] he is better off sober."  (Tr. 351; *accord* Tr. 488.)  Plaintiff reported some difficulty sleeping, but attributed it to "an old mattress that is not very comfortable."  (Tr. 351; *accord* Tr. 488.)

Dr. Winegarden noted that Plaintiff was "relaxed, casual, cooperative, [and] appropriate."  (Tr. 351; *accord* Tr. 489.)  Plaintiff was oriented, had a full affect, and exhibited "[n]o psychomotor agitation or retardation."  (Tr. 351; *accord* Tr. 489.) Plaintiff's mood was "euthymic, not depressed, not anxious, and full range."  (Tr. 351; *accord* Tr. 489.)  His speech was normal and his thought process was "[i]ntact, coherent, and organized."  (Tr. 351; *accord* Tr. 489.)  Plaintiff's judgment and insight were both intact.  (Tr. 351, 489.)  Dr. Winegarden directed Plaintiff to continue with Viibryd and added Seroquel[8] to Plaintiff's regimen.  (Tr. 351, 489.)

---

[7] Viibryd is a brand name for vilazodone, a medication used to treat depression.  *Vilazodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a611020 html (last visited on Feb. 16, 2018).
[8] Seroquel is a brand name for quetiapine, a medication used to treat depression and bipolar disorder.  *Vilazodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698019 html (last visited on Feb. 16, 2018).

When Plaintiff saw Dr. Winegarden the following month, he was having "racing thoughts" and was "quite agitated." (Tr. 349; *accord* Tr. 487; *see* Tr. 350, 488.) Plaintiff reported "[w]aking up kind of happy," but still "fe[lt] irritable, agitated, angry, chronically dysphoric or unhappy and [a] roller coaster ride of emotions." (Tr. 349; *accord* Tr. 487.) Plaintiff "fe[lt] powerless because his mind is in such a tissy [sic]." (Tr. 349; *accord* Tr. 487.) Plaintiff also "felt like he was going to have a stroke[,] light headed and dizzy." (Tr. 349; *accord* Tr. 487.) Plaintiff reported that he had previously taken Paxil,[9] which "worked really well," but he had stopped taking it because he was not allowed to donate plasma while on this medication. (Tr. 349; *accord* Tr. 487.)

While Plaintiff was oriented, Dr. Winegarden noted that he was agitated and irritable. (Tr. 349, 487.) Plaintiff displayed psychomotor agitation and was restless. (Tr. 349, 487.) His thoughts were disorganized and tangential and were positive for "psychosis, paranoia, grandiosity and auditory hallucinations." (Tr. 349; *accord* Tr. 487.) Plaintiff's affect was "labile and agitated," and his insight and judgment were both impaired. (Tr. 349; *accord* Tr. 487.) Dr. Winegarden diagnosed Plaintiff with bipolar disorder, directed Plaintiff to taper off Viibryd, and prescribed Paxil and Depakote.[10] (Tr. 349, 488.)

Plaintiff followed up with Dr. Winegarden towards the end of November. (Tr. 365.) Plaintiff reported that Depakote was helpful and he was a "lot less agitated." (Tr.

---

[9] Paxil is a brand name for paroxetine, a medication used to treat depression, panic disorder, and social anxiety disorder. *Paroxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698032 html (last visited on Feb. 16, 2018).

[10] Depakote is a brand name for valproic acid, a medication used in the treatment of bipolar disorder. *Valproic Acid*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682412 html (last visited on Feb. 16, 2018).

365.)  Plaintiff described himself as "mildly depressed."  (Tr. 365.)  Dr. Winegarden noted that Plaintiff was "relaxed, casual, cooperative, [and] appropriate."  (Tr. 366.)  Plaintiff was oriented and exhibited "[n]o psychomotor agitation or retardation."  (Tr. 366.)  Plaintiff's affect had "full range" and his mood was "euthymic, not depressed, not anxious, and full range."  (Tr. 366.)  Plaintiff's speech was normal; his thought process was "[i]ntact, coherent, and organized"; and his judgment and insight were intact.  (Tr. 366.)  Dr. Winegarden increased Plaintiff's Paxil prescription and continued Depakote. (Tr. 366.)

At his next appointment with Dr. Winegarden in December, Plaintiff reported that he was "doing ok" but was "still depressed."  (Tr. 365; *accord* Tr. 486.)  Plaintiff was, however, "feeling more and more anxious, nervous and worried."  (Tr. 365; *accord* Tr. 486.)  Plaintiff had been unable to increase his Paxil dose because the pharmacy had "not giv[en] him the right # of pills."  (Tr. 365; *accord* Tr. 486.)   This time, Dr. Winegarden noted that Plaintiff was "cooperative, but anxious, depressed and withdrawn."  (Tr. 365; *accord* Tr. 486.)  No adjustments were made to Plaintiff's medications.  (Tr. 365, 486.)

**D. 2014**

Plaintiff's next appointment with Dr. Winegarden was in early April 2014.  (Tr. 364, 485.)  While Plaintiff was less irritable, agitated, and paranoid and more social, he also reported worsening depression.  (Tr. 364, 485.)  Plaintiff complained of "low energy, poor motivation, and poor concentration."  (Tr. 364; *accord* Tr. 485.)  It was "more difficult [for Plaintiff] to enjoy things."  (Tr. 364; *accord* Tr. 485.)  Plaintiff felt unhappy, "hopeless, helpless and worthless."  (Tr. 364; *accord* Tr. 485.)  Dr. Winegarden increased

15

Plaintiff's Paxil dose and directed him to continue taking Depakote. (Tr. 364, 485.) When Plaintiff saw Dr. Winegarden again approximately one month later, he was doing "about the same," but found the increased Paxil dose helpful. (Tr. 363-64; *accord* Tr. 485.)

Plaintiff met with Dr. Winegarden again in mid-July. (Tr. 363, 484.) Plaintiff reported that he was "in a better place" and had moved to another sober residence. (Tr. 363; *accord* Tr. 484.) Plaintiff was "[e]asier to get along with," "[m]uch less stressed," and "doing well." (Tr. 363; *accord* Tr. 484.) Plaintiff was "able to enjoy things and . . . happy." (Tr. 363; *accord* Tr. 484.) His energy, motivation, concentration, appetite, and sleep were all within normal limits. (Tr. 363, 484.) Plaintiff "[d]enie[d] any symptoms of depression." (Tr. 363; *accord* Tr. 484.)

Dr. Winegarden observed Plaintiff to be "relaxed, casual, cooperative, [and] appropriate." (Tr. 363; *accord* Tr. 484.) He was oriented with "[n]o psychomotor agitation or retardation." (Tr. 363; *accord* Tr. 484.) Plaintiff's affect had "full range" and his mood was "euthymic, not depressed, not anxious, and full range." (Tr. 363; *accord* Tr. 484.) Plaintiff had normal speech and his though process was "[i]ntact, coherent, and organized." (Tr. 363; *accord* Tr. 484.) Plaintiff's judgment and insight were both intact. (Tr. 363, 484.) Dr. Winegarden increased Plaintiff's Paxil prescription again. (Tr. 363, 484.)

Plaintiff presented similarly at his next appointment with Dr. Winegarden in October. (*Compare* Tr. 483 *with* Tr. 363, 484.) Plaintiff reported that he "is doing good"

and was "working part-time."  (Tr. 483.)  Plaintiff also "continue[d] to stay sober."  (Tr. 483.)  Plaintiff's prescriptions were continued without modification.  (Tr. 483.)

### E.  2015

Plaintiff next met with Dr. Winegarden in early January 2015.  (Tr. 482.) Plaintiff's presentation was again similar to the July and October 2014 appointments. (*Compare* Tr. 482 *with* Tr. 483, 363, 484.)  Dr. Winegarden noted that Plaintiff was "doing well" and no changes were made to Plaintiff's medications.  (Tr. 482.)

The same was true when Plaintiff met with Dr. Winegarden in early April. (*Compare* Tr. 481-82 *with* Tr. 482, 483, 363, 484.)  Plaintiff reported that he was working at a warehouse. (Tr. 481.)  Although Plaintiff was "tired," he continued to "[d]en[y] any symptoms of depression."  (Tr. 481.)  Dr. Winegarden again described Plaintiff as "doing well" and made no adjustments to Plaintiff's medications.  (Tr. 481-82.)

At the end of May, however, Plaintiff "stopped into [Dr. Winegarden's] office stating he is in a crisis situation."  (Tr. 481.)  Plaintiff no longer had health insurance because he was "making too much [money]," but subsequently lost his job.  (Tr. 481.) Plaintiff was in the process of obtaining health insurance, but was not presently able to afford his Paxil prescription.  (Tr. 481.)  Plaintiff "became agitated when [staff] asked if he c[ould] purchase some Paxil until [his] ins[urance] coverage" resumed.  (Tr. 481.)

Plaintiff's Paxil prescription was switched to Brintellix[11] for the time being and he was directed to continue taking Depakote.  (Tr. 481.)

When Plaintiff next saw Dr. Winegarden towards the middle of July, he was "doing better" and "got his insurance back."  (Tr. 493.)  Plaintiff reported feeling anxious in the morning.  (Tr. 493.)  Plaintiff was "relaxed, casual, cooperative, [and] appropriate." (Tr. 493.)  He was oriented and showed "[n]o psychomotor agitation or retardation."  (Tr. 493.)  He had a full affect and his mood was "euthymic, not depressed, not anxious, and [had] full range."  (Tr. 493.)  Plaintiff's speech was normal and his thought process was "intact, coherent, and organized."  (Tr. 493.)  His judgment and insight were likewise intact.  (Tr. 493.)  Dr. Winegarden increased Plaintiff's Depakote prescription.  (Tr. 493.)

Plaintiff reported "the 'usual'" at his next appointment with Dr. Winegarden in early October.  (Tr. 494.)  Plaintiff presented in the same manner as he had in July. (*Compare* Tr. 494 *with* Tr. 493.)

## IV. LEINONEN CONSULTATIVE EXAMINATION

In February 2014, Plaintiff participated in a consultative examination with Carol Leinonen, Psy. D.  (Tr. 354-57.)  Plaintiff reported that "he has 'depression and anxiety, a mood disorder and I'm an alcoholic I guess.'"  (Tr. 354.)  Plaintiff reported having depression for a long time and currently rated his depression as "mild" but also stated that he was irritated by his living situation at the sober house.  (Tr. 354.)  Plaintiff also reported "irritability and restlessness" at not being able to go outside due to the cold

---

[11] Brintellix is a brand name for vortioxetine, a medication used to treat depression.  *Vortioxetine (Brintellix) for depression: Overview*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0084208/ (last visited on Feb. 16, 2018).

weather.    (Tr. 354.)    Plaintiff "denied fatigue, lack of motivation or decreased interest/pleasure in daily activities."  (Tr. 354.)  Plaintiff "did report difficulties with interpersonal relationships."  (Tr. 354.)  Plaintiff generally spent time on his own and had 'trouble being in larger groups of people."    (Tr. 354.)    With respect to his anxiety, Plaintiff described worrying about the future, racing thoughts, and difficulty sleeping. (Tr. 354.)  Plaintiff reported "that he often feels tense and has difficulties relaxing."  (Tr. 354.)  Plaintiff also reported worrying about germs.  (Tr. 355.)

Plaintiff described his typical day as getting up around 8:30 a.m., dressing and performing his personal care, watching the news, and eating breakfast.    (Tr. 355.) Plaintiff prepared his own lunch and napped when tired.  (Tr. 355.)  In the evening, Plaintiff made his own dinner and watched more television. (Tr. 355.)  Plaintiff attended "groups and after-care on certain days," including AA meetings.  (Tr. 355.)  Plaintiff rode his bike to meetings in good weather, and "prefer[red] to be outside or riding his bike." (Tr. 355.)  Plaintiff stayed at home if he did not have a meeting.  (Tr. 355.)  Plaintiff also had assigned chores at the sober house, including cleaning and shoveling.  (Tr. 355.) Plaintiff's case manager helped him with any paperwork and the mail.  (Tr. 355.)

Leinonen observed:

> [Plaintiff] was casually dressed and adequately groomed.
> Gait and posture slower and somewhat awkward/clumsy.  He
> was frowning/scowling the entire appointment.    [Plaintiff]
> related in a rather odd manner, he was talking to himself
> under his breath, he had a grunting type vocal tic and he
> presented as if he was agitated but he wasn't rude.  He was
> cooperative as far as answering questions.   He tended to
> answer with short, direct answers.   He provided some
> spontaneous information but usually it was negative in nature,

> about problems at the sober house with the other residents or problems he was having due to the current weather. . . . [Plaintiff's] speech was relevant, coherent and normal in terms of rate and tone but he was somewhat louder as far as volume. Motor activity level was fidgety; attention span was just adequate and eye contact was very avoidant with just some quick, occasional glances upwards. . . . [Plaintiff's] mood was nervous and affect was congruent. . . . [Plaintiff] was fully orientated. . . . [Plaintiff] was able to recall events and details of personal past history, current events and daily routine. General knowledge, ability to abstract and social judgment appeared low average . . . .

(Tr. 356.) Leinonen found "no indications of a thought disorder, paranoid or delusional thinking during the evaluation." (Tr. 356.)

Leinonen diagnosed Plaintiff with depressive disorder, anxiety disorder, simple phobia, Asperger's syndrome by history, mood disorder per Plaintiff's report, and alcohol dependency in remission. (Tr. 356.) Leinonen noted:

> He is reporting mild symptoms of depression but appears to continue to struggle with anxiety issues including a germ phobia. He reports he has been diagnosed with a mood disorder but he is not reporting any specific symptoms at this time. He reports he has maintained his sobriety for 23 months (2 years in March). He also is presenting with symptoms consistent with autism spectrum disorders, poor communication skills, lack of social relationships, poor eye contact, and vocal tic for example. He had an odd presentation. . . . [Plaintiff] appeared able to understand, retain and follow simple verbal directions. He appeared likely to have difficulties with more complex or demanding directives. . . . [Plaintiff] had some difficulties on simple mental tasks requiring minimal pace and persistence. He tended to be difficult to understand as he would give somewhat limited answers that he appeared to think were adequate. . . . [Plaintiff's] social skills are seriously impaired by the symptoms. . . . [Plaintiff's] ability to tolerate stress is below average due to his anxiety and poor communication skills.

20

(Tr. 356.)  Leinonen described Plaintiff's prognosis as "guarded to poor."  (Tr. 356.)

## V. DISABILITY REPORTS

Plaintiff participated in a phone interview in October 2013 in connection with his SSI application.   (Tr. 233-25.)   The interviewer observed no difficulties with understanding, coherency, concentrating, talking, or answering.   (Tr. 234.)   The interviewer noted that Plaintiff had "no problems answering questions."  (Tr. 234.)

In November 2013, Kaley assisted Plaintiff in completing a function report.  (Tr. 245-52.)  Plaintiff was described as having "had a limited work capacity over his life time, this became worse at the time of his moving out of his mother's home when she was placed in a nursing home."  (Tr. 245.)  Kaley noted that Plaintiff "was recently diagnosed with Aspergers/Tourettes—significant difficulty in relationships to others[.]" (Tr. 245; *see* Tr. 252.)  Kaley reported that Plaintiff "lived at home, primarily supported by his mother until 2006," and currently lived in sober housing.  (Tr. 245, 252.)

Plaintiff's daily activities included watching television, reading the newspaper, riding his bike, preparing meals, performing chores around the sober house, and attending AA meetings.  (Tr. 246; *see* Tr. 247.)  Plaintiff was able to perform his personal care and take his medication without assistance.  (Tr. 246-47.)  Plaintiff got around by walking, riding his bike, and getting rides from others.  (Tr. 248.)  Plaintiff shopped in stores for some groceries and personal items, but most of his groceries were delivered.  (Tr. 248.) Plaintiff also did "some shopping by bicycle" approximately one hour per week.  (Tr. 248.)

Plaintiff described his hobbies and interests as being outside and reading the newspaper.  (Tr. 249.)   Plaintiff reported doing these activities "almost daily" and experienced "no changes" in these activities as a result of his conditions.  (Tr. 249.) Although the "No" box was checked in response to whether Plaintiff spent time with others, it was reported that Plaintiff attended "mandatory meetings" two times per week, including AA meetings and "treatment group."   (Tr. 249.)   Plaintiff needed encouragement to attend these meetings.  (Tr. 249.)  When asked if Plaintiff needed someone to accompany him, Kaley checked "Yes" and explained that Plaintiff "does better if someone who he knows is with at [the] meeting—difficulty w[ith] new social environments." (Tr. 249.)

It was noted that Plaintiff had difficulty getting along with others and concentrating due to his conditions.  (Tr. 250; *see* Tr. 252, 281.)   Plaintiff had a "[d]ifficult relationship with [his] brother" and "difficulty forming/maintaining relationships with peers/social contacts related to Aspergers/Autism."  (Tr. 250; *see* Tr. 252.)   It was also noted that Plaintiff "has always had difficulty, beginning in childhood[,] with bullying by others."  (Tr. 250.)  Kaley noted that Plaintiff "describes a history of difficulty with others, communication in work settings related to Aspergers— easily frustrated as he appears to others as avoidant."  (Tr. 250; *see* Tr. 251, 252, 281.) Plaintiff reported being terminated from previous jobs because of problems getting along with others, stating he "'didn't fit in,'" "'didn't see things their way,'" and "'didn't level with them.'"  (Tr. 251.)

It was additionally reported that Plaintiff had difficulty handing stress, which caused "increase[d] tics, teeth grinding, muttering, [and] noises." (Tr. 251.) Plaintiff had "difficulty with roommate changes[ and] schedule change[s]." (Tr. 251.)

When asked if Plaintiff had any unusual behavior or fears, Kaley checked "Yes" and noted "tics, muttering noises, [and] teeth grinding." (Tr. 251.) Kaley also stated that Plaintiff "describes 'pervasive' negative thoughts." (Tr. 251.)

In subsequent disability reports, Plaintiff reported no change in his mental conditions. (Tr. 268, 271, 285, 288.)

## VI. DISABILITY DETEMINATIONS

During the initial SSI determination, Plaintiff was found to have the severe impairments of an affective disorder, alcohol/substance-addiction disorder, and anxiety disorder. (Tr. 130.) Amy S. Johnson, Ph.D., determined that Plaintiff's severe impairments did not meet or equal listings 12.04 (affective disorders) and 12.06 (anxiety disorders). (Tr. 130-132.) In considering the "B" criteria of these listings, Johnson concluded that Plaintiff had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of an extended duration. (Tr. 130.) Johnson also concluded that Plaintiff did not meet the "C" criteria. (Tr. 130.)

When assessing Plaintiff's mental residual functional capacity, Johnson opined that Plaintiff had no understanding or memory limitations. (Tr. 133.) With respect to Plaintiff's sustained concentration and persistence limitations, Johnson opined that

23

Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods but was otherwise not significantly limited. (Tr. 133.) Similarly, with respect to Plaintiff's adaptation limitations, Johnson opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting but was not otherwise significantly limited. (Tr. 134.)

As for Plaintiff's social interaction limitations, Johnson opined that Plaintiff was moderately limited in his abilities to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 133-34.) Plaintiff was not significantly limited in his abilities to ask simple question, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 133-34.)

Johnson explained her opinion as follows:

> Careful consideration has been given to [Plaintiff's] statements regarding alleged symptoms and their effects on functioning. [Plaintiff's] allegations of s[ymptoms] appear credible as these are supported by the Consultant and [medical evidence]. However, in terms of level of severity of functioning [Plaintiff's] allegations appear partially credible given [activities of daily living] appear [within normal limits], attention and concentration are moderately impacted but appear reasonable for tasks, and [Plaintiff] appears to be able to tolerate superficial, casual interactions with others.
>
> [Plaintiff] has the mental capacity to understand, remember, and follow instructions. [Plaintiff] is restricted to work that involves brief, superficial interactions [with] fellow workers, supervisors and the public. Within these parameters [Plaintiff] is able to sustain attention and concentration skills

24

> to carry out work like tasks with reasonable pace and persistence.

(Tr. 134.)  Plaintiff was determined to be capable of performing past relevant work and therefore not disabled.  (Tr. 135.)

On reconsideration, Sharon Frederiksen, Ph.D., L.P., affirmed Johnson's findings.

(Tr. 145-47, 149-51.)  Frederiksen augmented Johnson's comments with the following:

> [Plaintiff] has the mental capacity to understand, remember, and follow instructions.  [Plaintiff] is restricted to work that involves brief, superficial interactions [with] fellow workers, supervisors and the public.   Within these parameters [Plaintiff] is able to sustain attention and concentration skills to carry out work like [sic] tasks of at least 3[-]4 steps with reasonable pace and persistence.  [Plaintiff's] ability to handle stress and pressure in the work place would be reduced but adequate to handle the stresses of a routine repetitive or a 3-4 step work setting.  It would not be adequate for the stresses of a detailed or complex work setting.   [N]o rapid or frequent changes in tasks.
>
> No change indicated on Recon[sideration], continues to improve on meds and remains sober.

(Tr. 150.)  Plaintiff was determined to be capable of performing other work and therefore not disabled.  (Tr. 15-52, 164.)

## VII. ALJ PROCEEDINGS

### A.  Hearing Testimony

#### 1.  Plaintiff's Testimony

At the hearing, Plaintiff testified that he lived in a sober house where he had his own room.  (Tr. 59.)  Prior to living in the sober house, Plaintiff lived with his parents until he was almost 50 years old.  (Tr. 67.)  Plaintiff testified that he had been sober for

over three years and continued to live at the sober house because he did not "have an income." (Tr. 62.) Plaintiff testified that he performed chores at the house such as doing the dishes, sweeping, vacuuming, and cleaning bathrooms. (Tr. 60-61.) In his free time, Plaintiff watched television and read the newspaper and magazines. (Tr. 61; *see* Tr. 76, 85.) Plaintiff acknowledged that he would go shopping if he needed something from the store, but also testified that the sober house had "food delivery." (Tr. 61.) Plaintiff also testified that he drove. (Tr. 59.)

Plaintiff testified that he did not spend time with friends, but attended AA meetings three times per week. (Tr. 61, 63.) When asked by the ALJ what kind of treatment he had received for his mental conditions, such as whether he had been seeing a therapist, Plaintiff answered "No." (Tr. 60.) In response to questioning by his attorney, however, Plaintiff testified that Dr. Winegarden was his psychiatrist. (Tr. 62.)

When asked what problems would prevent Plaintiff from working a janitorial/custodial job if one were offered to him, Plaintiff testified that morning hours were difficult for him because he did not sleep well and it was tough for him to get up in the morning. (Tr. 59-60.) With respect to prior employment, Plaintiff testified that he felt "it got be a grind after about two to three months." (Tr. 65.) Plaintiff testified he would also get agitated, which would lead to problems with performance and getting along with others. (Tr. 65.) Plaintiff testified that the difficulties he had getting along with others often led to termination of his employment. (Tr. 66.)

### 2. Kaley's Testimony

Kaley also testified at the hearing.  (Tr. 69-82.)  Kaley testified that she was Plaintiff's counselor and had known him for approximately three years.  (Tr. 70, 71, 73, 74.)  When asked what problems she had observed that might prevent Plaintiff from working, Kaley responded:

> He has Asperger's, so he has a pattern [sic] of relating to others.  He appears angry.  He does not make any eye contact.  He grunts when he gets tense and he rolls his angers [sic] a lot.  He does not respond appropriately to conversation, so he stays very isolated in the community.  Otherwise, familiar [sic], because he has been with us for a long time.  He is isolated in the community.

(Tr. 71; *see* Tr. 72, 85.)  Kaley also testified that Plaintiff has "Tourette's" and will, at times, shout out two certain statements when he gets "particularly anxious."  (Tr. 72.)  After "shout[ing] out those two statements real loud[, Plaintiff ] . . . then . . . will make a real loud guttural, almost like a roar."  (Tr. 72.)  Kaley testified that she is not sure what triggers this particular reaction in Plaintiff, but she has witnessed it in their group sessions approximately once per month.  (Tr. 72.)

Kaley additionally testified about some of Plaintiff's behaviors.  Kaley testified that Plaintiff "has worn a blue shirt every day since he has been with us, the same color blue that he is wearing today," and refuses to wear any other color of shirt.  (Tr. 72.)  Plaintiff also insisted on wearing "a blue sweatshirt hoodie" and refused to wear a winter coat, despite the fact that Plaintiff had picked out the coat that was purchased for him.  (Tr. 72.)  When Plaintiff arrived at the treatment center, "he move[d] all the dishes in the kitchen area from one sink to the . . . dish drainer."  (Tr. 72-73.)

27

Kaley testified that Plaintiff's condition has remained about the same in the approximately three years that she has known him other than that she believes Plaintiff feels safe with the treatment center staff.  (Tr. 73.)  Kaley explained:

> [W]hen he first got to us he was very, very agitated and we have moved him.  He is in a second sober house now with his own room, so there have been times where he has been very escalated or agitated with a certain personality or when we have moved him.  He spends a period of time that he is very agitated and nervous.  That is when he shouts more and rolls his fingers more and then he is usually—if he—then he gets—once he gets to know people or once he becomes more familiar he gets over it.  If there is new people in group he tends to get agitated, and I know he has gotten very agitated at AA meetings, a particular one at [a] church that he doesn't go to anymore . . . I don't know what triggers him, that gets him upset.

(Tr. 73-74.)

Kaley testified that Plaintiff does not socialize with others.  (Tr. 74-76, 84-85.) Kaley testified that Plaintiff did not have friends that visited him and Plaintiff became "very, very agitated" when his brother visited every few months.  (Tr. 74.)  Occasionally, Plaintiff's cousin took him to dinner and visited on major holidays.  (Tr. 75.)  Plaintiff kept to himself at the sober house and did "everything by himself."  (Tr. 75; *see* Tr. 76.) Kaley testified that Plaintiff would respond if spoken to, but did not engage in small talk. (Tr. 76.)   Kaley identified deficits in communication and interacting with others as inhibiting Plaintiff's ability to "fend[] for himself," including his tics and demeanor.  (Tr. 84.)  Kaley also testified that she had witnessed Plaintiff decompensate, particularly at his first sober residence, where he would withdraw and retreat to be by himself.  (Tr. 84.)

With respect to living at the sober house, Kaley testified that it was not designed as a permanent residence but as a transitional residence, such as from residential treatment to independent living. (Tr. 77.) Kaley testified that Plaintiff was an exception because he did not have anywhere else to go and was unable to work. (Tr. 77; *see* Tr. 82.) Plaintiff also did not "have a support system." (Tr. 82.) Kaley testified that Plaintiff would not be able to make it on his own because

> he doesn't know how to interact with people. He doesn't relate to others. He can't hold a job, he can't. He needs help with just tasks of getting through. You know, like if it is a banking thing. He can maybe do some of it on his own but he needs help with the—talking to the people. Like if he has to talk to people or do any kind of communication he needs help for sure.

(Tr. 78; *see* Tr. 82.) As another example, Kaley testified that while Plaintiff could go grocery shopping, he needed help budgeting his money and making appropriate food choices. (Tr. 78-79.) Kaley testified that Plaintiff places a food order through the sober house every two weeks and the manager reviews his order to make sure it is appropriate. (Tr. 79.) Staff also monitored Plaintiff's medications so that he did not run out. (Tr. 85.)

Kaley also testified that she considered Plaintiff to be a vulnerable person, but acknowledged that no additional steps had been taken on Plaintiff's behalf. (Tr. 79.) Kaley testified that Plaintiff was "a little bullied" at his first sober residence and "would get very upset." (Tr. 81.) Kaley testified that Plaintiff did not know that he was being bullied but "fe[lt] it." (Tr. 81.) Kaley explained that Plaintiff had been bullied for most of his life and had been protected by his parents while living with them. (Tr. 81.) Kaley testified that Plaintiff "get[s] very upset" when talking about these experiences. (Tr. 81.)

29

Kaley also testified that an acquaintance of Plaintiff's would try to take advantage of him if Plaintiff was living on his own. (Tr. 83.)

### 3. Lace's Testimony

Michael A. Lace, Psy. D., testified as the medical expert. (Tr. 57, 86-95, 492.) Lace identified a number of Plaintiff's prior diagnoses in the record, including bipolar disorder, major depressive disorder, dysthymic disorder, obsessive compulsive disorder, anxiety disorder, Asperger's disorder, and substance addition disorder. (Tr. 86-87.) With respect to an organic mental disorder, Lace described the evidence as being "a little bit up for grabs." (Tr. 87.) Lace noted the findings of the 2013 neuropsychological evaluation and varying GAF[12] scores, ranging from 45 to 60 in 2009, to 32 to 59 in 2012, and to 60 in 2014. (Tr. 88.) Lace noted that the lower GAF scores were "a lot closer" to when Plaintiff's substance addiction disorder was "very active." (Tr. 88.)

Lace testified that none of Plaintiff's conditions met or equaled a listed impairment. (Tr. 88.) Lace opined that Plaintiff "would be limited to very brief and very superficial and very infrequent contact with supervisors and coworkers." (Tr. 89.) Lace opined that Plaintiff should have "no public contact at all, given the anxiety and Asperger's symptoms." (Tr. 89.) Lace further limited Plaintiff "to very simple, very routine, very repetitive tasks, low stress work," noting that "[a] high speed production

---

[12] The Global Assessment of Functioning ("GAF") scale is a rating of overall functioning on a scale of 0 to 100, taking into account psychological, social and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorder* 34 (Am. Psychiatric Ass'n 4th ed. text revision 2000). Scores of 31–40 indicates some impairment in reality testing or communications or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood. *Id.* Scores of 41–50 indicate serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* Scores of 51–60 indicate moderate symptoms or any moderate difficulty in social, occupational or school functioning. *Id.* The most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (Am. Psychiatric Ass'n 5th ed. 2013) "discontinued use of the GAF scale." *Mabry v. Colvin*, 815 F.3d 386, 391 n.6 (8th Cir. 2016).

line setting would be completely precluded."  (Tr. 89.)  Lace testified that Plaintiff "would work best on his own . . . with very limited contact with other people, except for supervisors."  (Tr. 89.)

Plaintiff's counsel asked Lace about the significance of certain scores in adaptive functioning from the June 2013 neuropsychological consultation based on the Vineland Adaptive Behavior Scales ("Vineland II").  (Tr. 89-91.)  Lace agreed that Plaintiff's socialization score was greater than five standard deviations below the mean, which essentially meant that Plaintiff's score was worse "than . . . if 100,000 people were randomly administered th[e] test."  (Tr. 90; *see* Tr. 315, 328.)  Lace also agreed that Plaintiff's behavior composite score was greater than three standard deviations below the mean, and would not be expected in a person of average intelligence.  (Tr. 91; *see* Tr. 315, 328.)  Lace likewise agreed that Plaintiff's communication score was four standard deviations below the mean.  (Tr. 91; *see* Tr. 315, 328.)

Plaintiff's counsel also questioned Lace about the B criteria.  (Tr. 92-93.)  Lace testified that Plaintiff was moderately limited in activities of daily living, social functioning, and maintaining concentration, persistence, or pace.  (Tr. 93.)  Lace further testified that Plaintiff experienced no episodes of decompensation of extended duration. (Tr. 93.)

Lastly, Plaintiff's counsel questioned Lace about the C criteria, specifically "a chronic history of one or more years['] inability to function outside a highly supported living arrangement, with an indication of continued need for such an arrangement."  (Tr. 93.)  Lace testified that "[t]here is no consistent data in the records suggesting an inability

31

to live outside of [Plaintiff's] current living situation." (Tr. 93.) Lace confirmed that his testimony was based on the record, not Kaley's testimony at the hearing. (Tr. 93.) Lace also confirmed that his testimony took into account Plaintiff's Vineland-II scores as well as the fact that Plaintiff had lived with his parents until he was approximately 50 years old. (Tr. 94, 95.)

### 4. Vocational Expert

In response to a hypothetical posed by the ALJ, the vocational expert testified that such a person could perform work as "cleaner II." (Tr. 96.) The vocational expert testified that this job would still be available even if the hypothetical individual's interaction with others was limited to "one[-]sixth" of the workday. (Tr. 97.) When asked about "the implications" of placing a person with Plaintiff's work history, mental conditions, and age, the vocational expert testified that, based on his experience, there are "a number of red flags" and he "would certainly consider it to be a very challenging attempt to place [Plaintiff] in a way" but could not "definitely say yes or no." (Tr. 100.)

### B. ALJ's Decision

The ALJ found and concluded that Plaintiff had the severe impairments of "anxiety, depression, Asperger's disorder, cerebral dysfunction, obsessive compulsive disorder, and history of substance abuse/dependence," and that none of these impairments when considered individually or in combination met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-16.) In reaching this determination, the ALJ considered listings 12.02 (organic mental disorders), 12.04 (affective disorders),

12.06 (anxiety related disorders), 12.09 (substance addiction disorders), and 12.10 (autistic disorder and other pervasive developmental disorders).

In relevant part, the ALJ found that Plaintiff had moderate restriction in activities of daily living. (Tr. 16.) The ALJ noted that Plaintiff reported no problems with performing his own personal care, performed yard work at the sober house, prepared his own meals, cleaned, did laundry, and shopped for groceries and some personal items. (Tr. 16.) The ALJ also noted that Plaintiff was working part-time. (Tr. 16.) The ALJ cited to Plaintiff's reports that he was able to pay bills, count change, handle a savings account and use a checkbook or money orders. (Tr. 16.) The ALJ also cited evidence that Plaintiff was sleeping well as of November 2013 and had a normal appetite in October 2014. (Tr. 16.) Lastly, the ALJ cited to Lace's testimony that Plaintiff had moderate restriction in this area. (Tr. 16.)

The ALJ next found that Plaintiff had moderate difficulties in social functioning. (Tr. 16.) Noting that Plaintiff reported problems interacting with others, the ALJ pointed to evidence that Plaintiff went on bike rides, shopped in stores, attended mandatory meetings on a weekly basis, and was described as cooperative by Dr. Winegarden. (Tr. 16.) The ALJ also pointed to a note from Dr. Winegarden that Plaintiff "was easier to get along with since moving to a new sober house." (Tr. 16.) The ALJ additionally cited Lace's testimony that Plaintiff had moderate difficulties in this area. (Tr. 16.)

With respect to the C criteria and Plaintiff's ability to function outside of a highly supportive living arrangement, the ALJ found and concluded that the evidence failed to establish the presence of the C criteria. (Tr. 16.) According to the ALJ:

> [Plaintiff] currently resides in sober housing. Previously, he
> resided with his parents. However, the record also shows that
> he was the primary caretaker for his mother after his father
> passed away. The record does not support a finding that
> [Plaintiff] is required to live in residential housing due to his
> mental impairments when not using mood-altering
> substances.

(Tr. 16.)

In assessing the opinion evidence, the ALJ gave great weight to Lace's opinion based on his "expertise in mental health, familiarity with the disability review process and his ability to review all of the evidence." (Tr. 18.) The ALJ also gave great weight to the neuropsychological consultation, including the Vineland II scores, finding it to be "generally consistent with the limits in the residual functional capacity based on the opinion of the medical expert." (Tr. 18.) The ALJ likewise gave great weight to the opinions of the state agency psychological consultants. (Tr. 21.) The ALJ stated that although the state agency psychological consultants did not examine Plaintiff, they "reviewed the evidence of record, including the consultative psychological evaluation observations, and utilized specialized knowledge in assessing mental impairments and resulting limitations within the SSA standard of disability." (Tr. 21.) The ALJ concluded that their opinions were "consistent with and supported by the overall evidence." (Tr. 21.)

The ALJ gave very little weight to Leinonen's consultative examination. (Tr. 16.) The ALJ found that Leinonen's conclusions were "not consistent with her observations during the interview or the GAF score" she assigned to Plaintiff. (Tr. 19.) The ALJ also found that Leinonen's opinion was "not supported by the record." (Tr. 19.) The ALJ

also determined that Plaintiff and Kaley's statements "concerning the intensity, persistence and limiting effects of . . . [Plaintiff's] symptoms [we]re not credible to the extent that [they were] not consistent with the objective medical evidence and other evidence," including Lace's opinion, "the observations by medical providers and [Plaintiff's] reported daily activities." (Tr. 21.) They were given "no weight." (Tr. 21.)

The ALJ found and concluded that Plaintiff was able to perform work at all exertional levels but had the following non-exertional limitations: brief, infrequent superficial contact with coworkers and supervisors; no public interaction, such as a cashiering or customer service; no complex or detailed work; and no high-production quotas. (Tr. 17.) Based on the vocational expert's testimony, the ALJ found that plaintiff was capable of working as a cleaner II and therefore was not disabled. (Tr. 22.)

## VIII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after

reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 1381a; *accord* 20 C.F.R. § 416.901. An individual is considered to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. § 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 416.912(a)(1).

Plaintiff's assignments of error concern step three and the determination of whether his mental impairments met or equaled a listed impairment. *See Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) ("The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." (citing 20 C.F.R. 416.920(a)(4)(iii))). Plaintiff asserts that (1) he has an impairment which meets listing 12.10 (autistic disorder and other pervasive developmental disorders); (2) his cerebral dysfunction, depression, and anxiety collectively meet or equal the C criteria for listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders); and (3) the ALJ erred in assigning great weight to Lace's opinion.

## A. Listings in General

"[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *accord Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014); *see* 20 C.F.R. § 416.920(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."). When a severe impairment meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, "the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

But, "[m]erely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan*, 493 U.S. at 530).

"To meet a listing, a claimant must show that he or she meets all of the criteria for the listed impairment." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (citing *Sullivan*, 493 U.S. at 531); *accord KKC ex. rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) ("An impairment meets a listing only if it meets *all* of the specified medical criteria." (quotation omitted)). "An impairment is medically equivalent under the regulations if it is 'at least equal in severity and duration to the criteria of any listed impairment.'" *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Id.* at 594 (quoting *Sullivan*, 493 U.S. at 531); *see* 20 C.F.R. § 416.926(b) (equivalence established when related findings are "at least of equal medical significance").

**B.  Listing 12.10**

Listing 12.10 addresses autistic disorder and other pervasive developmental disorders, which are "[c]haracterized by qualitative deficits in the development of reciprocal social interaction, in the development of verbal and nonverbal communication skills, and in imaginative activity." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10. "Often, there is a markedly restricted repertoire of activities and interests, which frequently are

stereotyped and repetitive." *Id.* Listing 12.10 is met when both the A and B criteria are satisfied. *Id.* Here, only the B criteria are at issue. The B criteria is satisfied when *at least two* of the following are present:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

*Id.* A "marked" limitation is "more than moderate but less than extreme." *Id.* § 12.00.C. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

## 1. Proposed Revised Medical Criteria for Evaluating Mental Disorders

Relying on his Vineland-II test scores and Lace's testimony that such scores "were three to five standard deviations below the mean in socialization, adaptive behavior, and communication," Plaintiff asserts that he has "extreme" limitations based on a 2010 notice of proposed rulemaking by the Social Security Administration titled *Revised Medical Criteria for Mental Disorders*, 75 Fed. Reg. 51336-01 (Aug. 19, 2010) [hereinafter "NPRM"]. (Pl.'s Mem. in Supp. at 19, ECF No. 13.) In the NPRM, the Social Security Administration proposed, among other things, incorporating the standard from 20 C.F.R. § 416.926a for functional equivalence in children into the definitions of "marked" and "extreme" limitations for adults. 75 Fed. Reg. 51342. Under § 416.926a,

a "marked" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). Similarly, an "extreme" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.* § 416.926a(e)(3)(i). Because Plaintiff's scores were at least three standard deviations below the mean, Plaintiff contends his test results are consistent with the NPRM's definition of "extreme" limitation in adults. Notably, as the Commissioner points out, the NPRM itself specifically stated that "[n]o single piece of information (including test scores) can establish whether a person has a marked or extreme limitation." 75 Fed. Reg. 51341. (Comm'r's Mem. in Supp. at 7, ECF No. 15.)

Ultimately, after an additional comment period specifically directed at the proposed definitions for "marked" and "extreme" limitations in adults, the Social Security Administration removed the references to standardized testing in the definitions of "marked" and "extreme" for adults. *Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-01, 66145 (Sept. 26, 2016) [hereinafter Final Rule]; *see Revised Medical Criteria for Evaluating Mental Disorders*, 75 Fed. Reg. 71632-01, 71632 (Nov. 24, 2010) (reopening the comment period for the limited purpose of "clarify[ing] and . . . seek[ing] additional public comment about an aspect of the proposed definitions of the terms 'marked' and 'extreme'"). Plaintiff himself acknowledges that "the proposed language related to standardized testing was not

40

ultimately included." (Pl.'s Mem. in Supp. at 19.) Therefore, to the extent Plaintiff challenges the ALJ's findings based on the NPRM, Plaintiff's argument is unavailing.

### 2. Activities of Daily Living & Social Functioning

Plaintiff next argues that the ALJ's findings that he has "moderate" limitations in his activities of daily living and social functioning are not supported by substantial evidence. According to Plaintiff, the evidence is consistent with at least "marked" limitations in each of these areas.

### a. Activities of Daily Living

Under the regulations, "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.1. The quality of these activities is assessed in the context of the claimant's overall situation based on "their independence, appropriateness, effectiveness and sustainability." *Id.* "[T]he extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction" is also considered. *Id.* A marked restriction in this area is not defined "by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." *Id.* Even if a claimant "do[es] a wide range of activities of daily living, . . . [a claimant may still] have a marked limitation in [the claimant's] daily activities if [the claimant] ha[s] serious difficulty performing them without direct supervision, or in a

suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.*

The ALJ found that Plaintiff had moderate restriction in his activities of daily living based on evidence in the record that Plaintiff had no problems performing his own personal care, performed chores around the sober house, prepared his own meals, did some shopping, and could handle money. (Tr. 16; *see* Tr. 20.) Additionally, the ALJ cited evidence that Plaintiff had worked part-time. (Tr. 16; *see* Tr. 20.) The ALJ also noted that Plaintiff reported sleeping well in November 2013 and had a normal appetite in October 2014. (Tr. 16.) And, as will be discussed below, the ALJ also relied on Lace's testimony that Plaintiff was moderately restricted in his activities of daily living. (Tr. 16.)

Plaintiff contends that the ALJ's finding is not supported by substantial evidence based on his current living arrangement. Citing Kaley's testimony, Plaintiff points out that there is "a staff resident available on the premises 24-hours each day" at the sober house and his grocery shopping is performed under the supervision of the house manager. (Pl.'s Mem. in Supp. at 23; *see* Pl.'s Mem. in Supp. at 30.) Plaintiff contends that he "is unable to perform independent living tasks if those tasks require[] any kind of communication." (Pl.'s Mem. in Supp. at 23.) Plaintiff also contends his mental impairments and concomitant communication difficulties make him a "poor historian[] with demonstrated deficiencies in his ability to relay relevant information," (Tr. 29), and the ALJ erred by relying heavily on his self-reports "rather than . . . the substantive opinions and conclusions of the medical professionals," (Tr. 30).

The Court begins with Plaintiff's argument that the ALJ erred by relying on his function report as an accurate description of his activities because his mental conditions do not make him a good historian. Kaley, Plaintiff's counselor, assisted in completing the function report. Indeed, Kaley appears to have completed the report. Kaley has known Plaintiff for an extended period of time. Kaley's participation presumably increased the accuracy and reliability of the information reported. Thus, even assuming Plaintiff's mental impairments impeded in some way the accuracy of his self-reporting, Kaley's assistance in the completion of the function report resulted in a more accurate description of Plaintiff's functioning than if Plaintiff had completed the function report himself.

Next, Plaintiff is correct that maintaining a residence and shopping are two activities considered when evaluating a claimant's activities of daily living. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.1. But, while Plaintiff does not live on his own and a staff member is on site at the sober house at all times, the ALJ correctly pointed to a number of activities that Plaintiff engages in at the sober house that demonstrate moderate restriction in his activities of daily living. Plaintiff prepares his own meals and performs a number of cleaning chores and yardwork. Plaintiff performs his own personal care. While Plaintiff receives some assistance with grocery shopping in that his food order is reviewed and groceries are delivered, Plaintiff also does some shopping on his own. Plaintiff is able to handle money. Elsewhere in the ALJ's decision, the ALJ noted that Plaintiff's daily activities included reading the newspaper and Plaintiff had resumed driving. And, for a period of time, Plaintiff was working part-time. *See Dunahoo v.*

43

*Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (seeking work and working part-time are inconsistent with allegations of disability). *But see Cline v. Sullivan*, 939 F.2d 560, 565-66 (8th Cir. 1991) ("An ALJ should not penalize a claimant who, prior to an award of benefits, attempts to make ends meet by working in a modest, part-time job.").

Plaintiff is essentially asking this Court to reweigh the evidence regarding his activities of daily living. "It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quotation omitted); *accord Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016). The Court concludes that substantial evidence supports the ALJ's determination that Plaintiff's mental impairments resulted in moderate restriction in activities of daily living based on the number of activities Plaintiff performed independently and appropriately on a regular basis.

### b. Social Functioning

"Social functioning refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.2. A claimant "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id.* Conversely, a claimant "may exhibit strength in social functioning by such things as [an] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id.* A marked difficulty in social functioning is not defined "by a

specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function." *Id.*

The ALJ found and concluded that Plaintiff had moderate difficulties in social functioning. Acknowledging Plaintiff's reported difficulties with social interaction, the ALJ pointed to evidence that Plaintiff went on bike rides, shopped, and attended mandatory meetings weekly as evidence of his social functioning. The ALJ also cited treatment notes from Dr. Winegarden that Plaintiff was cooperative and easier to get along with since moving to a new sober house. And again, as will be discussed below, the ALJ relied on Lace's testimony that Plaintiff had moderate difficulties in social functioning.

For the reasons that follow, the ALJ's analysis of Plaintiff's social functioning gives the Court pause considering the amount of evidence in the record suggesting that Plaintiff had more than moderate difficulties in social functioning. Nevertheless, in order for Plaintiff to meet listing 12.10, his mental impairments must satisfy at least *two* of the four B criteria. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10.B. Here, Plaintiff has not challenged the ALJ's findings with respect to two of the four criteria. And, as stated above, the ALJ's findings with respect to a third—activities of daily living—is supported by substantial evidence in the record as a whole. As a result, even though the ALJ's analysis of Plaintiff's social functioning gives the Court pause, Plaintiff cannot show that his mental impairments satisfy at least two of the B criteria and consequently cannot show that his mental impairments met all of the relevant criteria for listing 12.10.

Nonetheless, for purposes of completing the analysis on Plaintiff's social functioning, the Court turns to the evidence in the record and notes that the ALJ's discussion of Kaley's testimony is quite limited: "His case manager indicated that claimant has Asperger's and will shout out vulgar statements when anxious.  He is isolated.  He has difficulty interacting with others."  (Tr. 17.)  The ALJ gave Kaley's testimony "no weight" because it was "not consistent with the objective medical evidence and other evidence," including "the opinion of the medical expert, the observations by medical providers and [Plaintiff's] reported daily activities."  (Tr. 21.)

Kaley's testimony comprised approximately one-third of the hearing.  She testified at considerable length and in considerable detail regarding Plaintiff's difficulties interacting with others based on her observations as his counselor for three years.  Kaley testified that Plaintiff has trouble getting along with others and keeps to himself at the sober house with few visitors.  Most significantly, Kaley testified that Plaintiff makes inappropriate noises and has outbursts when agitated and that she has witnessed these types of reactions in group sessions approximately once per month.  As a licensed alcohol drug abuse counselor, Kaley is not an acceptable medical source.  *See* 20 C.F.R. § 416.913(a) (listing acceptable medical sources).  Yet, under the regulations, she is an "other source," and her testimony bears directly on the severity of Plaintiff's mental impairments, their effects on his social functioning, and ultimately how they affect his ability to work.  *See id.* § 416.913(d); *see also id.* § 416.912(b)(3) (including in the definition of evidence "[s]tatements . . . others make about your impairment(s) [and] your restrictions . . .").

46

The Commissioner is correct that the "ALJ is not required to discuss every piece of evidence submitted." *Hensley*, 829 F.3d at 932. (*See* Comm'r's Mem. in Supp. at 7.) But, the sparse discussion gives the Court pause when considering the other evidence relied on by the ALJ. For example, the ALJ gave great weight to the results of the 2013 neuropsychological consultation in assessing Plaintiff's residual functional capacity. One of the conclusions made was that Plaintiff's "[a]daptive skills are moderately or markedly low, *affecting communication and interaction*." (Tr. 315 (emphasis added); *accord* Tr. 328.) The evaluators went on to conclude that Plaintiff would do "best in positions that do not place much emphasis on social maturity and sustained interaction with others." (Tr. 316; *accord* Tr. 329.) Thus, while the Commissioner correctly asserts that the evaluators "never opined Plaintiff was markedly limited in social functioning," (Comm'r's Mem. in Supp. at 8), the ALJ ultimately gave great weight to evidence suggesting that Plaintiff had more than moderate difficulties in maintaining social functioning yet determined that Plaintiff was only moderately limited.

Further, as stated above, impaired social functioning may be demonstrated by, among other things, "firings, . . . avoidance of interpersonal relationships or social isolation." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.2. There is evidence in the record that Plaintiff's difficulty getting along with others was a significant factor in the termination of past employment. The record is also replete with evidence of avoidance of interpersonal relationships and social isolation. Plaintiff lived with his parents until he was almost 50 years old. The one individual described as Plaintiff's friend appears to have been both physically and emotionally abusive to Plaintiff and Plaintiff at times has

expressed concern that this person may try to take advantage of him financially.  Plaintiff has never had a significant other.  Plaintiff keeps to himself at the sober house and generally avoids interacting with others.  Plaintiff's cousin and brother will occasionally visit him, but Plaintiff becomes very agitated when his brother visits.

Plaintiff and the Commissioner each cite to treatment notes in support of their respective positions.  There are a number of treatment notes from different providers at various points in time describing greater and worse social functioning.  At times, Plaintiff is noted to be angry, hostile, and fearful; he makes inappropriate noises; and he demonstrates poor eye contact.  At other times, Plaintiff is noted to be relaxed and cooperative with no psychomotor agitation; he is more social; and he is easier to get along with.

There is some evidence in the record that could support the ALJ's determination that Plaintiff had moderate difficulties in social functioning.  Later treatment notes showed some improvement in Plaintiff's disposition with medication.  Plaintiff did report doing some shopping and attended several meetings each week.  The ALJ noted that Plaintiff went on bike rides, which arguably is some evidence that Plaintiff was not entirely socially isolated and went out into the community.  And like Lace, both of the state agency psychological consultants opined that Plaintiff had moderate difficulties in social functioning.

Determining whether substantial evidence supports the ALJ's decision "is more than an examination of the record for the existence of substantial evidence in support of the . . . decision." *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017) (quotation

omitted).  This Court must also "take into account whatever in the record fairly detracts from that decision." *Id.* (quotation omitted); *accord Chaney*, 812 F.3d at 676; *Boettcher*, 652 F.3d at 863.  In doing so, "a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Wilcutts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998); *accord Patrick v. Barnhart*, 323 F.3d 592, 595 (8th Cir. 2003).  When considering the record as a whole, this Court is hard pressed to conclude that the ALJ's determination that Plaintiff had moderate difficulties in social functioning is supported by substantial evidence in the record as a whole absent some explanation and reconciliation of the volume of evidence in the record suggesting that Plaintiff had greater difficulties in this area.[13]  Accordingly, under other circumstances, this Court would be inclined to remand this matter for further administrative proceedings.

As indicated earlier, however, Plaintiff's mental impairments must satisfy at least *two* of the four B criteria in order to meet listing 12.10.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10.B.  Plaintiff has not challenged the ALJ's findings with respect to two of the four criteria.  The Court previously concluded that the ALJ's determination with respect to a third is supported by substantial evidence.  Thus, even though the ALJ's determination with respect to the remaining criterion is not supported by substantial evidence, Plaintiff cannot show that his mental impairments satisfy at least two of the B criteria.  Therefore, Plaintiff cannot show that his mental impairments met all of the relevant criteria for listing 12.10.

---

[13] While Plaintiff also relies on Leinonen's opinion following the consultative examination, Plaintiff has not challenged the "very little weight" assigned to this opinion by the ALJ.  (Tr. 19.)

Because Plaintiff cannot show that his mental impairments meet at least two of the B criteria, the ALJ did not err in concluding that Plaintiff's mental impairments did not meet listing 12.10. *See KKC*, 818 F.3d at 370; *Blackburn*, 761 F.3d at 858.

### c. Lace's Opinion

The ALJ relied in part on Lace's testimony in the analysis of the B criteria. Lace testified that Plaintiff had moderate restriction in his activities of daily living and moderate difficulty in maintaining social functioning. The ALJ gave Lace's opinion great weight based on Lace's "expertise in mental health, familiarity with the disability review process and his ability to review all of the evidence." (Tr. 18.) Plaintiff contends that Lace's opinion was not entitled to great weight.

Medical opinions are statements from psychologists about the nature and severity of a claimant's impairments, including any symptoms, diagnosis, and prognosis; what the claimant is still able to do despite the impairments; and any mental restrictions. 20 C.F.R. § 416.927(a)(2). These opinions are weighed according to a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 416.927(c). These factors are also considered when evaluating the opinions of non-examining medical experts like Lace. 20 C.F.R. § 416.927(e)(2)(ii), (iii). The ALJ is required to consider the opinion evidence of these "highly qualified [individuals] . . . who are also experts in Social Security disability evaluation." *Id.* § 416.927(e)(2)(i).

50

Plaintiff argues that Lace's testimony was inconsistent with the findings of the neuropsychological consultation, Kaley's testimony, Leinonen's opinion, and treatment notes from Dr. Winegarden "variously describ[ing Plaintiff's] presentation as ruminating, agitated, nervous, anxious, hopeless, and helpless." (Pl.'s Mem. in Supp. at 29.) Plaintiff further argues that Lace offered no explanation for his opinion that Plaintiff had moderate limitations notwithstanding his test scores. Plaintiff argues that Lace essentially "prioritized [Plaintiff's] self-reports over the clinicians and medical providers who treated or examined him." (Pl.'s Mem. in Supp. at 29.) The Commissioner responds that the ALJ properly evaluated Lace's opinion based on his expertise in mental health, familiarity with the Social Security disability process, and ability to review the entire record. Additionally, the Commissioner responds that Lace's opinion was consistent with the record as a whole, including the functional limitations identified in the neuropsychological consultation and treatment notes from Dr. Winegarden.

The ALJ properly took into account Lace's specialization in mental health, expertise in Social Security disability evaluation, and opportunity to review all of the evidence in the record when determining the weight to be accorded to his opinion. *See* 20 C.F.R. § 416.927(c), (e). As stated above, there is substantial evidence in the record as a whole to support the ALJ's determination that Plaintiff has moderate restriction in activities of daily living and Lace's opinion to the same is supported by such evidence and consistent with the evidence in the record as a whole.

With respect to Lace's opinion that Plaintiff had moderate difficulties in social functioning, the Court has already discussed the conflicting evidence in the record on this

51

subject. While this Court may not have reached the same conclusion as the ALJ regarding the degree of limitation, the ALJ, and the Commissioner, correctly noted that Lace's opinion regarding Plaintiff's ability to interact with others was consistent with the functional limitations identified by the neuropsychological consultation evaluators. Lace's opinion was also consistent with Dr. Winegarden's later treatment notes, which, as stated above, showed improvement with medication. And, Lace's opinion was also consistent with the state agency psychological consultants, who both opined that Plaintiff had moderate difficulties in social functioning. To the extent Plaintiff relies on Leinonen's opinion and Kaley's testimony, Plaintiff has not challenged the little (Leinonen) or no (Kaley) weight the ALJ assigned to this evidence.[14]

It is the function of the ALJ, not this Court, to resolve conflicts in the evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007); *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). In light of the conflicting evidence in the record and the reasons given by the ALJ for according great weight to Lace's opinion, the Court concludes that the weight assigned to Lace's opinion was within the available zone of choice and is supported by substantial evidence in the record as a whole. *See Travis*, 477 F.3d at 1042; *see also Chaney*, 812 F.3d at 676; *Perks*, 687 F.3d at 1091.

### C. Listings 12.02, 12.04 & 12.06

Lastly, Plaintiff argues that his mental impairments meet or equal the C criteria in listings 12.02, 12.04, and 12.06. The C criteria of these listings takes into account the effects of structured settings on mental disorders. 20 C.F.R. pt. 404, subpt. P, app. 1,

---

[14] *See supra* n.13.

§ 12.00.F.  Listings 12.02 and 12.04 address organic mental disorders and affective disorders, respectively.  *Id.* §§ 12.02, 12.04.  In relevant part, the C criteria for listings 12.02 and 12.04 is satisfied with a certain medically documented history, "symptoms or signs currently attenuated by medication or psychosocial support," and a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement."  *Id.* § 12.02.C.3; *accord id.* § 12.04.C.3.  Listing 12.06 addresses anxiety-related disorders. *Id.* § 12.06.  The C criteria for listing 12.06 is satisfied with certain medically documented findings and a symptomology that "[r]esult[s] in complete inability to function independently outside the area of one's home."  *Id.* § 12.06.C.  This criteria "reflects the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home."  *Id.* § 12.00.F.

Recognizing that Plaintiff had previously lived with his parents and currently lived in sober housing, the ALJ concluded that the "record does not support a finding that [Plaintiff] is required to live in residential housing due to his mental impairments when not using mood altering substances."  (Tr. 16.)  The ALJ also noted that Plaintiff had served as "the primary caretaker for his mother after his father passed away."  (Tr. 16.)

As Plaintiff concedes, the relevant[15] regulations "define 'highly supportive' settings to include hospitals, halfway houses, care facilities, and personal home settings that 'greatly reduce the mental demands placed on [the claimant].'"  *Myers v. Colvin*, 721

---

[15] To the extent Plaintiff relies on the revised regulations for evaluating mental disorders, such regulations became effective as of January 17, 2017, well after the ALJ's decision in the present case.  *See Final Rule*, 81 Fed. Reg. 66138.

F.3d 521, 526 (8th Cir. 2013) (alteration in original) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F). For example, in *Wilson v. Astrue*, the claimant was determined to reside in "a highly supportive living arrangement because it [wa]s a group-living setting, [her] living needs [we]re met by the government and managed by a social worker, and [she] receive[d] help from a nurse on a weekly basis." No. 10-cv-418 (MJD/AJB), 2011 WL 916357, at *14 (D. Minn. Feb. 11, 2011), *adopting report and recommendation*, 2011 WL 938304 (D. Minn. Mar. 16, 2011). In *Barber v. Astrue*, a veteran's home was determined to be a highly supportive environment where the veteran's home "provide[d] meals to its residents, offer[ed] some psychology support services, transport[ed] residents to and from medical appointments, and administer[ed] all medication," and the only chores the claimant was responsible for performing were laundry and keeping his room clean. No. 11-cv-1221 (JRT/TNL), 2012 WL 3866646, at *25 (D. Minn. Aug. 16, 2012), *adopting report and recommendation*, 2012 WL 3854960 (D. Minn. Sept. 5, 2012).

Plaintiff contends that the sober house is a highly supportive living arrangement because he receives assistance with his grocery orders, receives "onsite" individual and group therapy, does not pay bills, and does not refill his medications. Plaintiff also cites to Kaley's testimony that he could not live independently and her observations that Plaintiff became agitated and nervous and displayed increased behavioral tics with changes in routine. Plaintiff additionally points to the opinion of the neuropsychological consultation evaluators that he "could be considered for future placement in a semi-independent or shared-living facility with on-site supports." (Tr. 316; *accord* Tr. 317,

329.)  Plaintiff also takes issue with the ALJ's lack of citation that he was the primary caretaker for his mother.

The Commissioner responds that the impetus for Plaintiff's placement in the sober house was not his mental impairments, but his substance abuse.  The Commissioner asserts, while Plaintiff continues to attend AA meetings, "the record does not support a finding that he receive[s] ongoing mental health treatment through the sober house." (Comm'r's Mem. in Supp. at 15.)  The Commissioner further asserts that, even if Plaintiff had "a current history of one or more years' inability to function outside a highly supportive living arrangement in the absence of mood altering substances, . . . there [i]s no indication of a continued need for such arrangement" based on Plaintiff's testimony that he has been sober for over three years and he continued to stay at the sober house for reasons other than his mental impairments, including a lack of income, other housing options, and transportation.  (Commr'r's Mem. in Supp. at 15.)  In addition, the Commissioner asserts that "semi-independent or even shared living facilities with on-site supports are not the type of 'highly supportive' living arrangements contemplated by the listings" and the ALJ could properly give Kaley's testimony no weight because it was inconsistent with the record.  (Comm'r's Mem. in Supp. at 14.)  Lastly, the Commissioner also points to a number of activities Plaintiff engaged in as evidence that he was able to function independently outside the sober house, such as going out by himself, driving, riding his bike, shopping in stores, and working a part-time job.

The Court concludes that the ALJ's determination with respect to the C criteria is supported by substantial evidence in the record as a whole.  Certainly, the structure and

support Plaintiff receives through the sober house appear to have a positive impact on his mental impairments. Nonetheless, as far as this Court is able to tell, Plaintiff can come and go as he pleases, performs his own personal care, attends medical appointments off site, is primarily responsible for administering his own medication, prepares his own meals, and independently performs a variety of chores. Thus, it would not appear that the sober house in the factual context of this case qualifies as a highly supportive living arrangement under the regulations. *See, e.g.*, *Shaw v. Colvin*, No. 1:15-cv-74-MP-GRJ, 2016 WL 4385863, at *11 (N.D. Fla. May 12, 2016) (house of claimant's sister was not highly supportive living arrangement where claimant largely cared for herself, including performing personal care, preparing meals, doing laundry, driving, shopping, performing community service, and helping care for children), *adopting report and recommendation*, 2016 WL 4394167 (N.D. Fla. Aug. 15, 2016); *Vann v. Astrue*, No. 09-249-GMS, 2011 WL 2416980, at *2 (D. Del. June 13, 2011) (sober group home was not highly supportive living arrangement were claimant was not restricted from leaving; left residence to attend appointments, visit mother, do laundry, and ride her bike; and performed chores under no time constraints); *see also Barber*, 2012 WL 3866646, at *25.

But, even assuming that the sober house qualifies as a highly supportive living arrangement, there is no dispute that Plaintiff's placement in the sober residence was due to his substance use, not his mental impairments. *See Doyle v. Comm'r of Soc. Sec.*, No. 6:15-cv-2131-Orl-PGB-PRL, 2017 WL 474107, at *3-4 (M.D. Fla. Jan. 13, 2017), *adopting report and recommendation*, 2017 WL 468424 (M.D. Fla. Feb. 3, 2017); *Vann*, 2011 WL 2416980, at *2. It is also undisputed that Plaintiff has maintained his sobriety

for a number of years, a significant and laudable accomplishment.  Kaley herself testified that Plaintiff was essentially an exception and had been allowed to remain at the sober house.  Further, the ALJ pointed to a number of activities indicating that Plaintiff's mental impairments did not result in a complete inability to function outside of the sober house, including taking bike rides, shopping, driving, and working part-time.  *See, e.g.*, *Perry v. Colvin*, No. 13-cv-1185 (JNE/TNL), 2014 WL 4113015, at *53 (D. Minn. Aug. 20, 2014) (substantial evidence supported ALJ's conclusion that claimant did not meet listing 12.06's C criteria where, although at times accompanied by someone else, claimant used public transportation to attend medical appointments and GED classes, and none of her treatment providers described claimant's anxiety as inhibiting her from functioning independently outside of her home).

The opinion of the neuropsychological consultation evaluators (along with evidence that Plaintiff has not successfully lived independently and Kaley's testimony) could support a finding of a continued need for *some type* of supportive living arrangement.  But, in order to meet or equal the C criteria, Plaintiff must present evidence indicating a continued need for a *highly* supportive living arrangement.  The same is true with respect to Plaintiff's ability to function independently outside of the sober residence.  While there is evidence in the record that Plaintiff has difficulty interacting with others and receives assistance with certain tasks, he has not shown that his mental impairments result in his inability to function independently outside of the sober house.

In sum, it is not the function of this Court to reweigh the evidence.  Again, if it is possible to draw two inconsistent positions from the evidence in the record and one of

those positions represents the ALJ's findings, this Court must affirm. *Chaney*, 812 F.3d at 676; *Perks*, 687 F.3d at 1091. Based on the foregoing, the Court concludes that the ALJ's determination with respect to the C criteria is supported by substantial evidence in the record as a whole.

## IX. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 12) is **DENIED**.

2. Defendant's Motion for Summary Judgment (ECF No. 14) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February___27___, 2018                          _____*s/ Tony N. Leung*_____
                                                        Tony N. Leung
                                                        United States Magistrate Judge
                                                        for the District of Minnesota

                                                        *Dols v. Berryhill*
                                                        Case No. 16-cv-3815 (TNL)